IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JEANNETTE MARIE KRAMER,<br><br>Plaintiff,<br><br>vs.<br><br>DADANT & SONS, INC.<br><br>Defendants. | CASE NO. 5:22-cv-1736<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**ORDER** |

Beginning in late November 2023, Magistrate Judge Darrell A. Clay and the above parties, represented by counsel, engaged in mediation efforts. Those efforts involved multiple, hours-long, mediation sessions, and months of post-mediation settlement discussions. Ultimately, in February 2024, the parties' reached a written settlement agreement, the final version of which was drafted by counsel for Defendant Dadant & Sons, Inc., and proceeded to take actions in accordance with that written agreement. But Dadant left out two words in the final version of the settlement agreement. And thus the instant dispute arose.

As the following analysis shows, the exclusion of those two words created an ambiguity in the parties' written agreement. That ambiguity, contrary to Plaintiff Jeannette Marie Kramer's arguments, is easy to clarify when one simply considers the circumstances surrounding the parties'

settlement. So for the reasons described below, Plaintiff's motion to enforce the parties' settlement agreement is DENIED, in large part, because each alleged breach has either already been cured or was not a breach at all, and GRANTED, in limited part as it relates to the mitigation of Kramer's damages, as described below in greater detail.

**Procedural History**

In September 2022, Kramer filed a complaint against Dadant. Doc. 1. In January 2023, the parties consented to the jurisdiction of this Court. Doc. 13. In September 2023, the Court referred this matter to Judge Clay for mediation and settlement. Doc. 37.

In November 2023, Judge Clay held a 10-hour mediation conference. *See* Minutes of Proceeding from November 29, 2023. Approximately one week later, he held a second mediation conference that lasted approximately five hours. *See* Minutes of Proceeding from December 7, 2023. From December 2023 through March 2024, the parties, with continued assistance from Judge Clay, negotiated the terms of their eventual written settlement agreement. *See e.g.*, Orders from January 26, 2024 and February 26, 2024; Doc. 66; Doc. 76 (and exhibits).

In May 2024, Kramer filed the current motion to enforce the settlement agreement. Doc. 67. In her motion, Kramer asserts that Dadant breached the parties' written settlement agreement and asks the Court to enforce the parties' settlement agreement through the following remedies:

2

1. Compensating Plaintiff for the time and attorney fees spent mitigating Defendant's breach in the amount of $1,922.50;
2. Ordering an independent accounting of Defendant's sales at Defendant's cost to determine the proper second settlement payment due to Plaintiff to fulfil ¶ 4 of the agreement;
3. Ordering full compliance with ¶ 5(c) of the agreement;
4. Ordering full compliance with ¶ 5(g) of the agreement;
5. Payment of all of Plaintiff's attorney costs since May 2, 2024 and for the remainder of this agreement; and
6. Compensatory and punitive damages that the Court finds just.

Doc. 68, at 10. Dadant responded in opposition, Doc. 69, and Kramer filed a reply, Doc. 70.

In July 2024, the Court held a hearing to address Kramer's motion to enforce the parties' settlement agreement. Doc. 72. During the July Hearing, the Court addressed an issue raised in Kramer's brief: what does the term "allowances," as used in their agreement, mean? The parties did not agree on a definition for the term *allowances*. Because the term was relevant to the calculation of royalty payments, which Kramer challenged in her motion, the Court ordered briefing on this term. *Id.*

Additionally, Kramer raised the issue of whether Dadant made only wholesale sales. During the hearing, neither party could show whether sales were made on a solely wholesale basis during the relevant time period. So the Court also ordered Dadant to provide Kramer and the Court with "an affidavit attesting to whether, during the relevant time period, it conducted sales on an

3

exclusively wholesale basis." Doc. 72. In August 2024, Dadant submitted an attestation of sales, including a sworn declaration from Matthew Ross, General Manager of Dadant. Doc. 75. Also in August 2024, the parties simultaneously submitted briefing on the meaning of *allowances*, as used in the parties' agreement. *See* Docs. 76, 77. With these submissions, Kramer's motion to enforce the parties' settlement agreement is now ripe for resolution.

**Legal Standard**

"Settlement agreements are contractual in nature and, as such, basic principles of contract law apply." *Ciuni & Panichi, Inc. v. N. Star Golf Ents.*, No. 94507, 2010 WL 3722282, at *2 (Ohio Ct. App. 2010) (citing *Rulli v. Fan Co.*, 683 N.E.2d 337, 338–39 (Ohio 1997)). And, since contracts are creatures of state law, Ohio's contract principles apply. *See e.g.*, *Smith v. ABN AMRO Mortg. Group Inc.*, 434 F. App'x. 454, 460 (6th Cir. 2011) (citing *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992)).

When a contract is unambiguous, a court does not look beyond the four corners of the writing itself to determine the intent of the parties. *See LublinSussman Group LLP v. Lee*, 107 N.E.3d 724, 729 (Ohio Ct. App. 2018). But if a contract is ambiguous, parol evidence may be employed to resolve the ambiguity and ascertain the intention of the parties. *Illinois Controls, Inc. v. Langham*, 639 N.E.2d 771, 779 (Ohio 1994). "Parol evidence reciting oral or written statements by the parties to each other prior to or contemporaneous with the execution of the agreement may be admitted to resolve such

4

ambiguities." *Clarke v. Hartley*, 454 N.E.2d 1322, 1326 (Ohio Ct. App. 1982); *see Camardo v. Timm*, No. 57795, 1990 WL 204316, at *2 (Ohio Ct. App. 1990) ("parties may testify as to their actual intentions to resolve the meaning of ambiguous contractual provisions"); *see also Butler Produce & Canning Co. v. Edgerton State Bank Co.*, 112 N.E.2d 23, 26 (Ohio 1953) ("For the purpose of determining the meaning of the parties and of explaining ambiguous language in the final contract, the preliminary draft was admissible in evidence.").

Although a contract is generally construed against the drafter, the court does not construe an ambiguous contract against the drafter when extrinsic evidence clarifies the meaning of that contract. *See LublinSussman*, 107 N.E.3d at 729; *see also City Life Dev., Inc. v. Praxus Group, Inc.*, No. 88221, 2007 WL 1290169, at *4 (Ohio Ct. App. 2007) (explaining that Ohio courts must "first examine parol evidence to determine the parties' intent" and that it is only "when parol evidence cannot elucidate the parties' intent, [that] a court must apply the secondary rule of contract construction whereby the ambiguous language is strictly construed against the drafter"). And, where ambiguous contract language is capable of multiple constructions, one fair and reasonable and one unusual, the reasonable interpretation will prevail. *See Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 954 (Ohio 1996).

**Discussion**

As an initial matter, Kramer's counsel conceded during the July Hearing that several of the issues raised in Kramer's motion were either not redressable

5

under the parties' settlement agreement or have since been resolved. The Court addresses these issues first.

As to Kramer's request for attorney's fees, the parties' agreement precludes the recovery of attorney fees and Kramer's counsel conceded that he did not anticipate he could recover them. *See* July Hearing, at 1:29:24 p.m.; *see also* Doc. 69, at 4 (citing the parties' settlement agreement in which it was agreed that each party was responsible for their own attorneys fees, including in an action arising out of the agreement). So to the extent that Kramer seeks attorney's fees in her Motion, *see* Doc. 68, at 10, that request is denied.

Next, Kramer's request that the Court order "full compliance" with paragraphs 5(c) and 5(g) of the parties' settlement agreement is no longer redressable.[1] As her counsel conceded, Dadant has since complied with those

---

[1]     Paragraphs 5(c) and 5(g) provide that, with regard to the production, use, and return of materials:

(c) Not later than April 30, 2024, Dadant will return to Kramer at Dadant's expense all of her molds, stencils, computer files, paper patterns, and the like. Dadant will provide an affidavit or sworn declaration affirming that it has returned all of Kramer's items in its possession.

. . . .

(g) Not later than April 30, 2024, Dadant will use its best commercial efforts to provide Kramer with one exemplar candle of each of her designs in Exhibit 1. The exemplar need only be the sculpted portion. Kramer will accept any "reference candles" that Dadant has in its possession. If Dadant is unable to provide an exemplar based on best commercial efforts, Dadant will provide a sworn statement to that effect.

Doc. 68-1, at 2.

provisions without Court intervention. *See* July Hearing, at 1:32:26 p.m. (counsel stating that affidavits that were provided after the filing of Kramer's motion to enforce resolved the paragraph 5 issues and "we don't have a basis to dispute the rest of the stuff" so "the only things open" are damages mitigation and whether the royalty statements applied the correct price); *see also* July Hearing, at 1:05:30 p.m. (counsel asserting that he has some unsupported suspicion about whether all items were returned, despite Dadant's affidavit, but conceding that the only outstanding issues are (1) the royalty issues, including indications of "zero" where no sale was made and the issue of calculating without allowances, and (2) the mitigation of damages related to delivery of products). Kramer conceded that everything described in paragraph 5 that should have been returned has since been returned with the appropriate certification. *See* July Hearing, at 1:33:40 p.m. So Kramer's requests that the Court order compliance with paragraphs 5(c) and 5(g) are denied as moot.

As to Kramer's request for payment related to her mitigation, Dadant indicated through its most recent filing, that a check for $200.00 has been sent to Kramer to compensate her for time spent mitigating her damages. *See* Doc. 76–9. The Court proposed, and the parties agreed, that it would be appropriate to award Kramer $100.00 for her time spent mitigating damages. *See* July Hearing, at 1:36:45 p.m. Despite Dadant's payment of $200.00, which appears to have been made in a good faith effort to resolve the instant dispute without

7

further Court intervention, the Court Orders only the payment of $100.00. The Court will leave it to Dadant to determine whether it wishes to request repayment of the excess sum. As to Kramer's request for discretionary monetary relief, the Court finds that there is no justification to award any further damages, compensatory or punitive, to Kramer.

The only live issue is thus Kramer's second enumerated request for relief: "Ordering an independent accounting of Defendant's sales at Defendant's cost to determine the proper second settlement payment due Plaintiff to fulfil ¶4 of the agreement[.]" Doc. 68, at 10. Paragraph 4 of the parties' settlement agreement provides:

> 4. <u>Settlement Royalty Payment</u>. Not later than April 30, 2024, Dadant will pay Kramer a royalty payment of twenty percent (20%) of all sales accrued, without allowances, for the period October 1, 2023 through April 1, 2024 for Dadant's Aureum candle and the candles set forth in Exhibit 1. Dadant will provide a single certified royalty statement containing candles sold by item number, sale value and royalty amount.

Doc. 68-1, at 2. Kramer's current arguments relate to Paragraph 4 and are premised upon her assertions that: (1) Dadant made sales at something other than wholesale sale prices, and (2) the term *allowances*, as used in Paragraph 4, means that the royalty calculation should be made based on something other than a wholesale sale price. *See generally* Doc. 68, 77. The Court rejects each of Kramer's remaining two arguments.

*First*, as to the issue of whether Dadant sold items only at wholesale prices during the relevant timeframe, it did. *See* Doc. 75. Kramer raised this

8

issue in her motion and at the July Hearing in an apparent effort to show that Dadant had improperly calculated royalty payments. *See* Doc. 68, at 3–5; July Hearing, at 1:20:25 p.m. Kramer, however, has not presented anything that would lead the Court to believe that Dadant sold items at anything other than a wholesale price. By contrast, Dadant has offered reasonable explanations and a declaration, sworn under penalty of perjury, from its General Manager attesting that it only sold items at a wholesale price. *See* Docs. 75, 76.

*Second*, and relatedly, Kramer's brief in support of her motion to enforce introduced the issue of the term "without allowances," when describing how the royalty payments should be calculated. *See* Doc. 68, at 4. This language appears in the context of the following sentence from the parties' settlement agreement: "Dadant will pay Kramer a royalty payment of twenty percent (20%) of all sales accrued, without allowances." *See* Doc. 77, at 1 (citing Paragraph 4 of the parties' settlement agreement). The term *allowances* is not defined by the parties' agreement. And the parties did not agree on the meaning of this term during the July Hearing. The Court, thus, provided the parties an opportunity to explain their interpretation of this language in the context of their settlement agreement to clarify this ambiguity. *See* Doc. 72, *see also Illinois Controls, Inc. v. Langham*, 639 N.E.2d at 779.

    1.    *The Court Rejects Kramer's Contract Interpretation Arguments*

From Kramer's perspective, "it is clear 'all sales accrued, without allowances' means list price sales, and 'allowance' includes any discount,

9

including a wholesale discount." *See* Doc. 77, at 1. Stated differently, under Kramer's interpretation, her royalty payment should be calculated based on the list price used by Dadant's customers to sell the product to an end consumer, rather than the wholesale price at which Dadant sells its products. If Dadant makes sales at wholesale prices *and* participates in direct or retail sales, then, Kramer asserts, her royalty payments received to date have been miscalculated to her detriment. *See generally* Doc. 68. As established above, however, Dadant makes sales only at wholesale prices.

So the Court is left to resolve whether Kramer's definition of *allowances* is reasonable in light of the circumstances surrounding the parties' agreement. If it is, the amount of royalty payments—which have to-date been based only on Dadant's profits based on wholesale prices—would need to be recalculated to account for the list price paid to distributors by consumers. But, as the following illustrates, Kramer's interpretation is not supported by, and is in fact contradicted by, the circumstances of the parties' agreement. *See Clarke*, 454 N.E.2d at 1326 (explaining that the court may consider extrinsic evidence concerning the circumstances surrounding the creation of a contract to resolve an ambiguity).

Kramer's arguments in support of her definition of *allowances* can be grouped into three categories: common meaning, common usage, and "uncommon interpretation, absurd result." Doc. 77 at 2, 4. Each of her arguments, however, fails to account for the circumstances of the parties'

10

settlement discussions and presents no controlling or compelling support for Kramer's interpretation.

*First,* Kramer points to a Black's Law Dictionary definition of *allowance*, which is defined as "[a] share or portion, esp. of money that is assigned or granted." Doc. 77, at 2. This definition is of little relevance to the instant circumstance. Kramer asserts that "[a] wholesale discount is granted to a customer based on volume or other consideration, it is therefore 'assigned or granted' as an 'allowance' under the dictionary meaning." *Id.* But nothing in this explanation relates specifically to what the parties may have meant at the time of contracting. *See Clarke*, 454 N.E.2d at 1326.

Additionally, Kramer asserts that a "backhaul allowance" is effectively a wholesale price. Doc. 77, at 2. But this is not persuasive because: (1) a *backhaul allowance*—"[a] price discount given to customers who get their goods from a seller's warehouse as a reflection of the seller's freight-cost savings," Doc. 77, at 2—is a more specific term than used in the parties' agreement, and (2) the assertion assumes that Dadant made sales at something other than a wholesale price. Although Kramer cites some brochures and Kramer's website, Kramer has failed to substantiate her claims that Dadant made anything other than wholesale sales during the relevant time period. She also provides no evidence to contradict Dadant's sworn declaration that it only makes wholesale sales. Kramer's first argument is thus unpersuasive.

*Second*, Kramer's argument related to common usage of the word *allowances* is contradictory and attempts to insert further confusion by urging that the term "sales" may have multiple interpretations. *See* Doc. 77, at 3. Kramer admits that her "case is peculiar" when analyzing "custom and usage" because the royalty payment at issue was agreed to in the context of a settlement agreement. *Id.* And Kramer has not pointed to any case that has interpreted *allowances* to contemplate sales made a retail price when the seller sold only at a wholesale price. Instead, she points to royalty agreements between parties as illustrated in the practice guide "Lindy on Entertainment, Publishing and the Arts." *Id.* None of the contract language excerpted appears to have been created under similar circumstances, provides insight into the circumstances of this agreement, or offers a definition of the word *allowances*. The Court is, thus, unpersuaded by this facet of Kramer's argument.

*Third*, Kramer's final argument is that excluding wholesale prices from a definition of *allowances* would lead to an absurd result. Doc. 77, at 4–5. To this end, Kramer implies, again through language in a practice guide, that periodic accountings would be appropriate because Kramer "cannot 'verify key variables,' such as an opaque and manipulatable wholesale price." *Id.* at 4. This argument is not well taken.

Kramer's continued citation to royalty agreements in the arts and entertainment setting again inserts confusion. The examples Kramer cites demonstrate that the traditional royalty contract circumstances anticipate an

12

ongoing relationship and sales. The parties in those circumstances thus include royalty calculations based on future sales. *See* Doc. 77–3. So Kramer's arguments related to "sales" is both unpersuasive and inapplicable. Further, nowhere in the instant settlement agreement is there any obligation for periodic accountings. And an ongoing accounting requirement, as Kramer asserts is common in the traditional royalty agreement setting, would not make sense here because the royalty payment amount is limited to a discrete period of time and the nature of the parties' settlement agreement does not contemplate anything other than a one-time payment. *See* Doc 68-1 (Paragraph 4, term at issue, pertains to the limited royalty period of October 1, 2023 through April 1, 2024).

Kramer asserts that if the Court does not interpret the term *allowances* to include retail prices, absurd results will follow. From Kramer's perspective wholesale prices, which are set by and paid to a single entity, are "opaque and manipulatable," unlike individual list sale prices, which are set by and paid to multiple distributors. *See* Doc. 77, at 4. While this argument is confounding, it is also irrelevant, considering it has nothing to do with the parties' intent at the time of contract creation. So the Court rejects Kramer's final argument.

    2.    *Dadant's Contract Interpretation Arguments are Adopted*

Dadant's arguments provide the Court with context specific, extrinsic evidence that reveals the parties' understanding of *allowances* at the time of drafting and demonstrates that Kramer's proposed interpretation was never

13

previously discussed. *See* Doc. 76. Dadant explains that, through the history of settlement negotiations, *Kramer's counsel* first introduced the word *allowances* when he proposed the language: "royalty for all sales as accrued *without allowances for returns*." Doc. 76, at 2 (emphasis added); *see* 76-2, at 2. According to Dadant, Kramer's counsel "did not further define, discuss or expand upon his use of the term 'allowances' other than that royalties would be paid 'without allowances for any returns' during the period. There had not been any discussion as the November Mediation regarding this term." Doc. 76, at 2–3; *see* Doc. 76-3. Dadant's brief and exhibits further show that—with the exception of the final, executed agreement—the language "for returns" was included and provided the clarifying context in which the term *allowances* should be read. *See* Doc. 76 at 3–4. Dadant has provided persuasive, extrinsic evidence that Kramer's counsel both proposed the language including *allowances* and that, at all times, the parties intended the word *allowances* to mean "without allowances for returns." *See Clarke*, 454 N.E.2d at 1326.

Although Dadant's counsel drafted the final agreement, when the Court examines extrinsic evidence to resolve an ambiguity, the traditional rule that contracts are construed against their drafter is not generally applicable. *See LublinSussman*, 107 N.E.3d at 729. There is nothing that indicates the parties intended to leave out the words "for returns." Instead this omission appears to be an inadvertent mistake. As such, the Court interprets that the parties' intent at the time of contracting was that the word *allowances* meant that

14

Kramer's royalty payment was to be calculated "without allowances for returns." The Court will also assume that Kramer's elaborate and contrary interpretations were made based on either a failure to identify or to recall discussions between the parties' during negotiations in which she, through counsel, first suggested the language "without allowances for returns."[2]

### 3. *None of Kramer's Arguments are Redressable or Meritorious*

As a result of the above analysis, none of Kramer's enumerated requests, *see* Doc. 68, provide a basis for relief. As to the sole issue that existed for resolution after the July Hearing—the meaning of *allowances* and potential royalty calculation issues depending on that meaning—the Court is unpersuaded by Kramer's arguments. The Court finds that Kramer has not provided any evidence that the royalty payments were miscalculated or improperly based on a retail sales price and that the term "without allowances" was intended to mean "without allowances for returns." Each of Kramer's arguments to enforce the settlement agreement have, therefore, either been resolved, rejected, or admitted as not redressable.

---

[2] Kramer's counsel asserted during the July Hearing that, with regard to the term *allowances*, "we put that in" because Kramer intended "for allowances to cover things like wholesale sales, bulk discounts, things like that." *See* July Hearing, 1:17:27 p.m. The extrinsic evidence considered in relation to this motion does not support this assertion. *See* Doc. 76; *see also* Docs. 76-1 through 76-9. Of note, in an email sent before Kramer filed her briefing on the term *allowances*, Dadant's counsel reminded Kramer's counsel that the parties' intended language was "without allowances for returns" and that Kramer's counsel first included this language. *See* Doc. 76, at 7 (citing Doc. 76-9 (July 23, 2024 email correspondence)).

15

**Conclusion**

For all of the foregoing reasons, Kramer's motion to enforce the parties' settlement agreement is DENIED, in large part, because all alleged breaches have already been cured or were never a breach at all, and GRANTED, in limited part as it relates to the mitigation of Kramer's damages.

**IT IS SO ORDERED.**

Dated: August 27, 2024

                                                */s/ James E. Grimes Jr.*
                                                James E. Grimes Jr.
                                                U.S. Magistrate Judge